UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                      :

UNITED STATES OF AMERICA,      :
                                        :

           - v. -           :                   S1 13 Cr. 563 (GBD)
                                        :

RUBEN PIZZARO,               :
    a/k/a "Chulo,"          :
                                        :

                    Defendant.     :
------------------------------------------------------- X

## GOVERNMENT'S MOTIONS IN LIMINE AND MOTIONS
## PURSUANT TO FEDERAL RULE OF EVIDENCE 404(b)

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Shawn G. Crowley
Kan M. Nawaday
Assistant United States Attorneys
     - Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully makes the following motions *in limine* and requests pursuant to Federal Rule of Evidence 404(b) with respect to the trial against Ruben Pizzaro, a/k/a "Chulo," which is presently scheduled to begin on August 18, 2015.  As discussed below, the Government seeks:

1. To offer at trial the testimony of an officer ("Officer-1") from the New York City Police Department ("NYPD") concerning statements made to him by the victim of a knifepoint robbery;

2. To preclude cross-examination of the victim concerning a prior arrest;

3. To introduce certain of the defendant's prior statements; and

4. To introduce certain of the defendant's prior acts and arrests as direct evidence, or, in the alternative, as evidence of prior bad acts under Federal Rule of Evidence 404(b).

## RELEVANT FACTS

In the early morning hours of October 12, 2012, Ruben Pizzaro, a/k/a Chulo, the defendant, along with Kurtis Peterson ("Peterson"), robbed a livery cab driver (the "Victim") at knifepoint in the Bronx, New York.  On or about July 25, 2013, a grand jury returned a one count Indictment, 13 Crim. 563 (GBD), charging both Pizzaro and Peterson with Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951.  Peterson pleaded guilty on or about August 14, 2013.  On or about June 9, 2015, a grand jury returned a two count Superseding Indictment, S1 13 Crim. 563 (GBD) (the "Indictment"), charging the defendant with Hobbs Act robbery (Count One) and conspiracy to commit Hobbs Act robbery (Count Two), in violation of Title 18, United States Code, Section 1951.

At trial, the Victim is expected to testify that, after having transported the defendant and Peterson in his livery cab to the vicinity of 182nd Street and Washington Avenue in the Bronx, the defendant held a knife to the Victim's throat and demanded in Spanish that the Victim give him money (the "Robbery").   Thereafter, the defendant and Peterson robbed the Victim of United States currency and began to flee.   As he was fleeing, Peterson turned and spat on the Victim's taxi.   The Victim immediately called the taxi dispatch service and reported that he had been robbed.

The Victim is expected to testify further that, after placing the call to the dispatcher, the Victim followed the defendant and Peterson in the taxi cab as they ran around the block.   As they were running, the defendant and Peterson shouted and threw bottles and rocks at the Victim's taxi.   The defendant and Peterson then ran inside a building located at 182nd Street and Washington Avenue (the "Building").   Several minutes after the Victim first placed the call to the dispatcher (which was immediately after the Robbery), NYPD officers arrived at the scene.

One of the NYPD officers ("Officer-1") is expected to testify at trial that, upon arriving at 182nd Street and Washington Avenue, Officer-1 immediately spoke with the Victim.   Officer-1 asked the Victim what had occurred.   The Victim responded that he had transported two males to 182nd Street and Washington Avenue in his taxi cab.   Upon arrival at 182nd and Washington, one of the males held a knife to the Victim's throat and demanded in Spanish that the Victim give him money.   The Victim further informed Officer-1 that the men then robbed the Victim of cash and ran away.   Officer-1 is expected to testify also that, when the Victim recounted the Robbery, the Victim appeared jittery and anxious.

Officer-1 recorded the Victim's statements in a police report that will be produced to the defendant as 3500 material in advance of trial.

2

## DISCUSSION

**I. OFFICER-1'S TESTIMONY CONCERNING THE VICTIM'S STATEMENTS IS ADMISSIBLE UNDER THE HEARSAY EXCEPTIONS FOR EXCITED UTTERANCES AND PRESENT SENSE IMPRESSIONS**

The Government seeks a ruling permitting the introduction at trial of Officer-1's testimony concerning statements made by the Victim shortly after the Robbery. Specifically, the Government seeks to introduce Officer-1's testimony that the Victim told Officer-1 that (1) the Victim transported two males in the Victim's taxi; (2) one of the males then held a knife to the Victim's throat and demanded that the Victim give him money; and (3) the males then robbed the Victim of cash. Because the Victim's statements were made shortly after the Victim had been robbed at knifepoint, and while the Victim was still excited and under stress, they fall within the excited utterance and present sense impression exceptions to the hearsay rule and are therefore admissible.

### A. Officer-1's Testimony Is Admissible Under The Longstanding Hearsay Exception For Excited Utterances

#### i.   Applicable Law

Under Rule 803(2) of the Federal Rules of Evidence, the normal bar on hearsay testimony does not apply to "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *See also United States* v. *Tocco*, 135 F.3d 116, 127 (2d Cir. 1998). Excited utterances are admissible because such statements are made "under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and . . . therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and . . . cross-examination would be superfluous." *Idaho* v. *Wright*, 497 U.S. 805, 820 (1990). In other words, "the excitement of the event limits the declarant's capacity to fabricate a statement and thereby

offers some guarantee of its reliability." *United States* v. *Tocco*, 135 F.3d at 127.  The declar-

ant's availability, moreover, is immaterial to whether the exception applies.  Fed. R. Evid. 803.

For a statement to qualify as an excited utterance, the proponent must establish that: (1)

there was a startling event; (2) the statements were made under the stress of that startling event;

and (3) the statements relate to the startling event.  *See* Fed. R. Evid. 803(2); *see also United*

*States* v. *Brown*, 254 F.3d 454, 458 (2d Cir. 2001); *Tocco*, 135 F.3d at 127.  An excited utterance

"need not be contemporaneous with the startling event to be admissible." *Tocco*, 135 F.3d at

127.  Rather, it must be contemporaneous with the excitement generated by the event.  *United*

*States* v. *Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003) (citing *United States* v. *Joy*, 192 F.3d

761, 766 (7th Cir. 1999)).  And, "[t]he length of time between the event and the utterance is only

one factor to be taken into account in determining whether the declarant was, within the meaning

of Rule 803(2), under the stress of excitement caused by the event or condition." *United States*

v. *Jones*, 299 F.3d 103, 112 (2d Cir. 2002) (internal quotation marks and citations omitted).

The declarant's physical and mental condition after the occurrence of a startling event is

indicative of the whether the declarant is still under the stress of the startling event.  *United*

*States* v. *Delvi*, 275 F. Supp. 2d at 415.  The Second Circuit has held that a declarant's "hyped"

and "nervous" "demeanor" is grounds for admitting his out-of-court statements as excited

utterances. *Tocco*, 135 at 128; *see also United States* v. *Harrison*, 101 F.3d 686 (2d Cir. 1996)

(holding that an officer's call to his dispatcher, while he was "extremely excited" and "scared,"

was admissible as an excited utterance); *United States* v. *Schreane*, 331 F.3d 548, 564-65 (6th

Cir. 2003) (a victim who appeared "nervous," "scared," "excited," and in need of being "slowed

down" "supports a finding that [the victim] made his statement while still under the sway of

excitement [and thus that] the district court did not abuse its discretion in admitting [the]

4

statement as an excited utterance."); *United States* v. *Martin*, 59 F.3d 767, 769 (8th Cir. 1995) (victim's statement made while he was observed by a third party to be "scared" and "nervous" was admissible as an excited utterance).

Finally, the fact that a statement is made in response to questions from a police officer, rather than as an unsolicited exclamation, does not render the statement inadmissible. "That the statement was made to a police officer . . . does not, ipso facto, deprive the statement of the indicia of reliability that provide the basis for this hearsay exception." *United States* v. *Gambardella*, S2 10 CR 674 KBF, 2012 WL 279469, at *3 (S.D.N.Y. Jan. 27, 2012); *see also Delvi*, 275 F. Supp. 2d at 416 ("Declarations relating to the circumstances of a violent crime, made by the victim shortly after its occurrence . . . may be admissible although made in response to an inquiry."); *United States* v. *Joy*, 192 F.3d at 767 (declarant responding to questions does not indicate that he was not under stress caused by a startling event); *Webb*, 922 F.2d at 393 (declarant's answer to question, "Do you know who shot you?" did not destroy the response's "spontaneity").

### ii.   Application

The statements the Victim made to Officer-1 shortly after the Robbery qualify as excited utterances under Rule 803(2) of the Federal Rules of Evidence.

*First*, it is clear that the event at issue here was a startling one. The Victim informed Officer-1 that the Victim had just been held up at knife point, in the Victim's taxi cab, in the middle of the night. Being robbed at knife point unquestionably constitutes a startling event. *See, e.g.*, *Flythe* v. *D.C.*, 4 F. Supp. 3d 222 (D.D.C. 2014) (holding that an attempted stabbing was a startling event that justified an excited utterance exception to the hearsay rule); *Whittaker* v. *Lafler*, 639 F. Supp. 2d 818, 828 (E.D. Mich. 2009) (statements made by victim "[w]hen the

officers arrived at the scene soon after learning of the 911 call, [and the victim] was crying, hysterical, visibly shaken and upset following the startling event of petitioner's wielding of the knife and chasing her" were properly admitted under the excited utterance exception); *Dixon* v. *Kernan*, No. 05 Civ. 5777 (OP), 2009 WL 3122777, at *7 (C.D. Cal. Sept. 25, 2009) (statement made to police officer by child who had just seen petitioner attempt to stab his mother was excited utterance where child appeared to be "extremely nervous").   Nor can there be any question that the Victim had personal knowledge of the startling event, *see Tocco*, 135 F.3d at 128; the Victim's statements make clear that the Victim was the person who was held up by the defendant.

*Second*, the Victim's excited utterances were made in the period of excitement directly following the startling event.  The Robbery occurred just minutes before the Victim spoke with Officer-1.   And the startling events did not end with the Robbery.   As noted, the Victim is expected to testify that, right after they robbed him, Peterson and the defendant threw bottles and rocks at the Victim's cab, and then disappeared into the Building.  When the police arrived, the defendant and Peterson had not been apprehended, and were likely still lurking in the Building. The Victim's stress and agitation over having just been robbed had not subsided.   Indeed, Officer-1 is expected to testify that, when he took the Victim's statements, the Victim was visibly agitated and nervous.  *Tocco*, 135 F.3d at 128 (witness's testimony concerning statements made to him by a victim who appeared "all hyped" and "nervous" were properly received as excited utterances).

*Third*, and in a similar vein, there can be no dispute that the Victim's out-of-court statements (*i.e.,* the description of the Robbery and subsequent events) related to the startling event (*i.e.*, the Robbery).

*Finally*, the fact that the Victim's statements were made in response to questions from Officer-1, rather than as an unsolicited exclamation, does not render the statements inadmissible. Officer-1's questioning does not reduce the "indicia of reliability" of the Victim's statements. *United States* v. *Gambardella*, 2012 WL 279469, at *3 (victim's statements recounting assault made to police officer at police station were excited utterances).  As noted, Officer-1's conversation with the Victim occurred just minutes after a knife had been held to his neck, at the scene of the crime, while the perpetrators remained at large.  The Victim was still anxious and afraid, and his statements bore the same indicia of reliability as they would had they been made spontaneously.  Moreover, Officer-1 is expected to testify that the Victim's recounting of the Robbery was made in response to Officer-1's general question about what had transpired, and not "the detailed, interrogation-style questioning that might negate the use of the excited utterance exception."  *United States* v. *Graves*, 756 F.3d 602, 606 (8th Cir. 2014)

Because the Victim made his statements to Officer-1 during the period of excitement directly following a startling event, and because the statements related directly to the startling event, the statements are admissible under Rule 803(2).

### B.  Officer-1's Testimony Is Also Admissible Under The Longstanding Hearsay Exception For Present Sense Impressions

The Federal Rules of Evidence also specifically make admissible, and exclude from the hearsay rule, present sense impressions—*i.e.*, statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."  Fed. R. Evid. 803(1).  Such statements "are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory."  *United States* v. *Jones*, 299 F.3d 103, 112 (2d Cir. 2002).  By the plain terms of the Rule, a statement may qualify as a present sense impression even if the declarant is

not describing an event as it unfolds.  In fact, the Advisory Committee Note to Rule 803(1) specifically states that "in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable."  *See, e.g.*, *Jones*, 299 F.3d at 113 (affirming admission of statements to an off-duty police officer that were "nearly contemporaneous with the event described").

Not surprisingly given the foregoing, courts routinely admit as present sense impressions statements made to police by individuals reporting what they had observed after an incident occurred.  *See United States* v. *Ibanez*, 328 F. App'x 673, 675 (2d Cir. 2009) (holding that a witness' statement to police identifying the defendant "within maybe 5 minutes" was a present sense impression); *Gambardella*, No. S2 10 CR 674 KBF, 2012 WL 279469, at *2 (S.D.N.Y. Jan. 27, 2012) (holding that a statement made by a victim to police officers after the ten-minute drive to the police station is an "excited utterance" because "the ten-minute delay between the incident and the time [the victim] made [the statement] after his car ride to the police station [does not] change[]" its nature as an excited utterance).

The Victim's statements here were made nearly contemporaneous with—indeed, just minutes after—the Robbery.  Thus, the Victim's statements about the Robbery fit well within the present sense impression hearsay exception.  Accordingly, the Government respectfully requests that the Officer be permitted to testify about the Victim's statements concerning the circumstances of the Robbery.

## II. THE DEFENDANT'S PRISON CALL AND EMAIL CONTAIN ADMISSIONS AND EVINCE CONSCIOUSNESS OF GUILT AND ARE THUS ADMISSIBLE

### A. Background

On June 8, 2013, shortly after he was arrested, Kurtis Peterson placed a call from jail to the defendant (the "June 2013 Call").  During that call, Peterson and the defendant discussed,

among other things, their encounter with the Victim on October 12, 2012.  Specifically, the

defendant told Peterson:

> Yeah, you gotta tell them he, he was drunk, though, bro . . . . Yeah,
> he was drunk that day, bro. He threw a President – a Presidente
> Dominican drink at you. He was drunk. I remember everything like
> it was yesterday, bro. It was on camera and on all, bro. Say he
> threw something at you and was drunk, bro. He started wilding.

Later in the call, the defendant instructed Peterson:

> But you gotta tell 'em the truth, you hear? You gotta tell 'em the
> truth. He was drunk.

On February 13, 2015, the defendant, who was then in prison, wrote an email to Peterson

(the "February 2015 Email").  In that email, the defendant wrote, among other things:

> DUB I AIN'T WORRIED BOUT NOTHING I AIN'T GOT
> NOTHING ANY WAY I LOST EVRYTHING LET THIS BE A
> WAKE UP CALL 4 YU SO  NEXT TIME YU THINK ABOUT
> SPITTIN SWOLLOW THAT SHIT dick cuz we didnt even rob
> that nigga or temted to nigga framed us so when yu go to the town
> no funny shit just fall back word liv that pa. life/cuz thats the best
> thing right now the block got nothing for us but another bid
> loooove yu bro

The statements referenced above are admissions of a party opponent, and, pursuant to

Rule 801(d)(2), are not hearsay.  Moreover, the statements all evince the defendant's conscious-

ness of his guilt.  For these reasons, the statements contained in the June 2013 Call and the

February 2015 Email should be admitted at trial.[1]

---

[1] Attached hereto as Exhibit A is a rough transcript of the full June 2013 Call between the
defendant and Kurtis Peterson.  Attached hereto as Exhibit B is the full February 2015 Email.
The Government seeks to introduce only those portions of the call and email quoted in text.  The
remaining portions are either not relevant or not admissible.  Nor are they necessary to explain
the portions of the statements the Government seeks to admit.  *See* Fed. R. Ev. 106; *United
States* v. *Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) ("The completeness doctrine does not . . .
require the admission of portions of a statement that are neither explanatory nor relevant to the
admitted passages.") (citations omitted).

### B.  Applicable law

Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial . . . offered in evidence to prove the truth of the matter asserted."  However, Rule 801(d)(2)(A) provides that a statement is not hearsay when it is offered against an opposing party and "was made by the party in an individual or representative capacity."  *See United States* v. *Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party."); *United States* v. *Watts*, 934 F. Supp. 2d 451, 466 (E.D.N.Y. 2013) (admitting recorded statements of defendant under Rule 801(d)(2)(A)).

Moreover, "[e]vidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt."  *United States* v. *Perez*, 387 F.3d 201, 209 (2d Cir. 2004).  "Such evidence is admissible if the court (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested."  *Id.* (citing *United States* v. *Mickens*, 926 F.2d 1323, 1328-29 (2d Cir. 1991)).

It is well-established that evidence of witness tampering is probative of consciousness of guilt, and thus admissible at trial.  *See United States* v. *Triumph Capital Group, Inc.*, 544 F.3d 149, 160 (2d Cir. 2008) ("Spadoni's efforts to obstruct the investigation evidence a consciousness of guilt that further supports the jury's verdicts."); *United States* v. *Perez*, 387 F.3d 201, 208 (2d Cir. 2004) (offer of bribe and request to provide false testimony was evidence of conscious-

ness of guilt); *United States* v. *Mickens*, 926 F.2d 1323, 1329 (2d Cir. 1991) (evidence of attempt to intimidate a witness by making a hand gesture in the shape of a gun was relevant to showing the defendant's consciousness of guilt); *United States* v. *Robinson*, 635 F.2d 981, 986 (2d Cir. 1980) (evidence of witness tampering, including efforts to have witness sign false letter exonerating defendants, admissible to show consciousness of guilt).

### C. Application

The defendant's statements in the June 2013 Call and the February 2015 Email are highly relevant to the facts at issue in this case.  They are also admissions –they place the defendant in the cab with Peterson on the night of the Robbery.   The statements are therefore admissible under Rule 803(d)(2)(A).

Furthermore, the defendant's statements are clear and compelling evidence of the defendant's consciousness of his own guilt.  In the call and the email, the defendant attempted to coordinate his story with Peterson. The defendant instructed Peterson to claim falsely that the Victim was intoxicated.  This is witness tampering, and is a strong indication that the defendant was conscious of – and attempted to mask – his own guilt.  Because the defendant's statements evince his consciousness of guilt, the jury is entitled to hear them.  *See Triumph Capital Group*, 544 F.3d at 161; *Perez*, 387 F.3d at 208-09.

### III. THE DEFENDANT SHOULD BE PRECLUDED FROM CROSS-EXAMINING THE VICTIM CONCERNING THE VICTIM's 2001 ARREST

#### A. Background

On or about February 28, 2001, the Victim was arrested by the NYPD in the Bronx, New York for involvement in a traffic altercation.  The Victim was charged with assault with intent to cause serious physical injury, menacing in the second degree, and criminal possession of a weapon in the fourth degree.  All of the charges were subsequently dropped.

11

In the course of preparing for trial, the Victim has met with the Government on three occasions.   In response to the questions concerning the Victim's background, the Victim informed the Government of his arrest.

### B.  Applicable Law

The Confrontation Clause of the Sixth Amendment guarantees the right of a defendant in a criminal case to be confronted with the witnesses against him.  *Delaware* v. *Van Arsdall*, 475 U.S. 673, 678 (1986); *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 955 (2d Cir. 1990). "This means more than being allowed to confront the witness physically, for the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."  *United States* v. *Maldonado-Rivera*, 922 F.2d at 955 (internal quotation and citations omitted).

The Confrontation Clause does not, however, deprive the trial judge of all discretion in setting limits on cross-examination during trial.

> On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Delaware* v. *Van Ardsall*, 475 U.S. at 679.

Rule 608(b) provides that, "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  *See* Fed. R. Evid. 608(b).   This rule gives broad discretion to the trial judge to limit cross-examination in this area.[2]   It states that in the

---

[2] Indeed, the law in this Circuit is clear that, "[a]s long as a defendant's right to confront the witnesses against him is not violated, limitations on cross-examination are not grounds for

discretion of the court, if "probative of the character for truthfulness or untruthfulness" of the witness, specific instances of prior conduct "may" be inquired into on cross-examination concerning a witness's character for truthfulness or untruthfulness.  Fed. R. Evid. 608(b)(1).

The Second Circuit has determined that conduct is probative of a witness's truthfulness and therefore admissible under Rule 608(b) where, for example, the witness has previously given false testimony, made false statements on official documents, or been determined by a judicial officer not to be credible.  *See, e.g.*, *United States* v. *White*, 692 F.3d 235, 249 (2d Cir. 2012), as amended (Sept. 28, 2012) (district court erred in prohibiting cross-examination of Government witness concerning judge's finding that witness was not credible in prior judicial proceeding); *United States* v. *Schatzle*, 901 F.2d 252, 255 (2d Cir. 1990) (noting witness' omission of prior arrest on bar application was "relevant to [the witness'] capacity for truthfulness"); *United States* v. *Terry*, 702 F.2d 299, 316 (2d Cir. 1983) ("Proof that a judge of the District of Columbia Superior Court before whom [expert had testified] had found that [expert] had 'guessed under oath' was probative of the weight to be accorded to his testimony.").

In addition, among the factors that a court should consider in determining whether to permit cross-examination under Rule 608(b) is how long ago the act in question occurred. "[R]emoteness in time remains a relevant factor to consider the probative value of the evidence" for impeachment under Rule 608(b).  *United States* v. *Jackson*, 882 F.2d 1444, 1448 (9th Cir. 1989).  Indeed, the Second Circuit has noted that prior conduct becomes less probative of a witness' credibility the longer ago it occurred.  *See United States* v. *Schwab*, 886 F.2d 509, 513

---

reversal."  *Roldan-Zapata*, 916 F.2d at 806.  Curtailment of cross-examination does not constitute an abuse of the trial court's discretion as long as "the jury is in possession of facts to make a 'discriminating appraisal' of the particular witness's credibility" and possible motives for testifying falsely in favor of the government.  *United States* v. *Rosa*, 11 F.3d 315, 336 (2d Cir. 1993) (citations omitted).

(2d Cir. 1989) (noting that the prior conduct was of even less probative value because it had occurred twenty-three and eighteen years prior to the trial); *see also United States* v. *Brown*, 07-CR-874 (KAM), 2009 WL 497606, at *4 (E.D.N.Y. Feb. 26, 2009) ("[T]he length of time that has passed since the alleged prior conduct is also relevant to the court's exercise of Fed. R. Evid. 608(b) discretion.").

Finally, evidence of prior conduct is, like all other evidence, inadmissible under Rule 403 if the district court "finds that the 'probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *United States* v. *Crowley*, 318 F.3d 401, 417 (2d Cir. 2003) (internal citations omitted). Evidence that is "unfair[ly] prejudic[ial]" means evidence that would invite the jury to decide an issue material to the outcome of the case for reasons that have nothing to do with the legal issues to be decided. *See United States* v. *Harvey*, 991 F.2d 981, 996 (2d Cir. 1993); *United States* v. *Borello*, 766 F.2d 46, 59 (2d Cir. 1985); *United States* v. *Jamil*, 707 F.2d 638, 644 (1983). In addition, evidence of prior conduct may be precluded under Rule 403 where the facts underlying the conduct are so circumstantial and convoluted that a "mini-trial" would be required to determine what took place. *United States* v. *Stewart*, 433 F.3d 273, 313 (2d Cir. 2006); *United States* v. *Crowley*, 318 F.3d at 418 (preclusion of cross-examination proper where "inquiry would at best have produced confusing and distracting sideshows regarding the facts of controversies completely unrelated to the charges against [the defendant] at trial").

### C. Application

Cross-examination concerning the Victim's 2001 arrest plainly is not within the ambit of Rule 608(b), which permits cross-examination only where a specific instance of conduct is

"probative of the character for truthfulness or untruthfulness."  Fed. R. Evid. 608(b)(1).

*First*, the Victim's arrest is nothing more than unproven, alleged conduct, which has no probative value as to the issues in this case and has nothing whatsoever to do with the Victim's character for truthfulness.  Any inquiry into this irrelevant incident would be nothing more than a "[s]ide excursion[] into the witness's past, [that is] unrelated to the substantive issues being tried, [and would] create a real danger of confusing the issues and prolonging the trial." Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 608-9[2] (2d Ed. 1997).  Indeed, courts in this Circuit have used their wide discretion over the scope and extent of cross-examination to preclude defense cross-examination concerning prior conduct that has no bearing on a witness's truthfulness, even where the conduct is much more serious than that at issue here.  *See, e.g*., *United States* v. *Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002) ("Murder generally is not a crime of dishonesty"); *United States* v. *Rosa*, 11 F.3d 315, 336 (2d Cir. 1993) (district court properly precluded cross-examination on alleged rape and burglary by witness because conduct did not bear directly on witness's credibility and allegations were unsubstantiated); *United States* v. *Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) (district court properly barred inquiry into alleged murder by informant because insufficient evidence that murder occurred or that it was committed by informant); *United States* v. *Scarpa*, 913 F.2d 993, 1017-18 (2d Cir. 1990) (cross-examination about witness's alleged involvement in attempted contract murder barred as not probative of truthfulness or untruthfulness).

*Second*, the Victim's arrest occurred nearly fourteen years ago.  That fact alone warrants preclusion of cross-examination about the incident.  *See United States* v. *Schwab*, 886 F.2d at 513.  Whatever probative value the arrest may have had as to the Victim's truthfulness when it occurred (and the Government submits that it had none) has long since dissipated.

15

*Third*, permitting inquiry into the Victim's 2001 arrest is unduly prejudicial and risks confusing the jury as to what are the actual issues it must decide. *United States* v. *Stewart*, 433 F.3d at 313. Indeed, in order for the jury to decide how the incident affects the Victim's credibility, the Court would need to conduct a "mini-trial" to determine what exactly occurred in 2001—a process that could necessitate calling witnesses and attempting to reconstruct events that occurred over a decade ago. Such lengthy and confusing distractions from the issues and charges on trial are precisely the dangers Rule 403 is intended to protect against. *Id.*; *see also Crowley*, 318 F.3d at 418; *United States v. Jeffers*, 402 F. App'x 601, 603 (2d Cir. 2010) ("Moreover, even if the alleged abuse was somehow relevant to [witness's] motivations for testifying, which is not clear, the district court did not abuse its discretion in concluding that any probative value was substantially outweighed by unfair prejudice and the need for a mini-trial on domestic disputes.").

Cross-examination of the Victim concerning his 2001 arrest would have no probative value and would serve only to distract and inflame the jury. Accordingly, the Government respectfully requests that the defense be precluded from inquiring into the arrest on cross-examination.

## IV. THE GOVERNMENT SHOULD BE PERMITTED TO OFFER EVIDENCE OF CERTAIN OF THE DEFENDANT'S PRIOR ACTS AND ARRESTS

### A. Relevant Facts

The defendant was arrested on at least thirty separate occasions before his arrest in this case. None of those arrests resulted in convictions. However, the Government intends to offer evidence of a small subset of those arrests at trial, both as direct evidence and as evidence of prior uncharged crimes under Federal Rule of Evidence 404(b). The arrests the Government intends to introduce at trial are:

- The defendant's arrest with Kurtis Peterson on March 5, 2011 in the Bronx.

- The defendant's arrest on August 17, 2011 for criminal possession of a knife.

- The defendant's arrest on East 180th Street and Bathgate Avenue in the Bronx, New York on October 5, 2012.

In addition, the Government will offer evidence at trial that, on at least three occasions in February and March 2012, the defendant was found to be residing at the Building into which he fled after committing the Robbery. Specifically, the defendant will call a parole officer from the New York City Parole Office ("Parole Officer-1") who will testify that, in early 2012, she supervised a parolee who resided in an apartment in the Building (the "Apartment"). Parole Officer-1 made five home visits to the Apartment in February and March 2012. On four of those visits, Parole Officer-1 observed the defendant in the Apartment. Parole Officer-1 is expected to testify further that, based on the defendant's clothing at the time of each visit, the occupants of the Apartment, and other observations she made, she believes that the defendant was residing in the Apartment when she made the home visits.

### B. Applicable Law

As the Second Circuit has repeatedly held, evidence of uncharged acts is admissible, without regard to Rule 404(b), when it constitutes intrinsic or direct proof of the charged crimes. *See, e.g.*, *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). Such evidence is admissible as direct evidence "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Id.* (internal quotation marks omitted) (quoting *United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)); *United States* v. *Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly

17

establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

Evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged such as when the evidence demonstrates "the context of certain events relevant to the charged offense."  *United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994).  Such evidence may also be properly admitted as direct evidence, to show, for example, the development of an illegal relationship between the defendant and his co-conspirators, and to explain the mutual trust that existed between co-conspirators.  *See United States* v. *Rosa*, 11 F.3d at 333-34 (evidence of prior acts of car theft and drug dealing properly admitted to show development of illegal relationship between defendant and co-conspirator and to explain how defendant came to play important role in conspiracy); *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it).

"Other acts" evidence may also be admitted under Rule 404(b) so long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect.  *See United States* v. *Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("[O]ther acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity").  Rule 404(b)(2) identifies that proper purposes for other act evidence include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of

accident." *Id.*

The Second Circuit has held that "[o]ne legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.  Such proof may also be used to help the jury understand the basis for the co-conspirators' relationship of mutual trust." *United States* v. *Pipola*, 83 F.3d 556, 566 (2d Cir. 1996); *see also United States* v. *Rahim*, 339 Fed. App'x. 19, 22 (2d Cir. 2009) (summary order) (evidence of prior insider trading permissible to show insider trading by showing background, course of dealing between co-conspirators, intent and absence of mistake); *United States* v. *Derosena*, 186 Fed. Appx. 27, 29 (2d Cir. 2006) (summary order) (prior fraudulent acts admitted to show prior course of dealings between co-conspirators).  The Second Circuit has also held repeatedly that corroboration of Government witnesses is an appropriate, non-propensity purpose for admitting other acts evidence.  *See, e.g.*, *United States* v. *Everett*, 825 F.2d 658, 660-61 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted); *United States* v. *Williams*, 577 F.2d 188, 192 (2d Cir. 1978) (holding that other acts evidence is admissible "for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant").

The Second Circuit takes an "'inclusionary' approach" to the admission of other-act evidence, under which "'evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity,' as long as it is 'relevant to some disputed issue in the trial' and satisfies the probative-prejudice balancing test of Fed. R. Evid. 403." *United States* v. *Brennan*, 798 F.2d 581, 589 (2d Cir. 1986) (citations omitted); *see United States* v. *Gelzer*, at 1139-40 (allowing circumstantial evidence from prior unrelated and uncharged

robbery where it established defendant's connection to a weapon used in present case).   The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion.  *See United States* v. *Inserra*, 34 F.3d at 89.  Indeed, the admission of prior bad acts in conspiracy cases is an area where the "Second Circuit has afforded significant leeway."  *United States* v. *Nektalov*, 325 F. Supp. 2d 367, 371 (S.D.N.Y. 2004) (collecting cases); *see also, e.g.*, *United States* v. *Langford*, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history.").

And while any evidence offered pursuant to Rule 404(b) is subject to the balancing test set forth in Rule 403, the Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial.  *United States* v. *Roldan Zapata*, 916 F.2d at 804; *United States* v. *Williams*, 205 F.3d 23, 3334 (2d Cir. 2000); *see also United States* v. *Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *cf. Constantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

With respect to the admissibility of prior acts evidence under Rule 404(b) to prove identity, the touchstone is simply relevance.  *See, e.g.*, *United States* v. *Tubol*, 191 F.3d 88, 95 (2d Cir. 1999) ("Because eyewitnesses testified that the perpetrator of both robberies carried a gun, the government was entitled to offer evidence that Tubol had a gun when arrested to show that he had the means to commit the robberies."); *United States* v. *Tice*, 133 F.3d 908, 908 (2d Cir. 1998) ("The fact that Tice had previously been convicted for growing plants in the same location

made it more likely than not that it was he, rather than someone else, who had grown the plants in this instance.  The prior conviction, therefore, was admissible under Rule 404(b) to establish identity."); *United States* v. *Gubelman*, 571 F.2d 1252, 1255 (2d Cir. 1978) ("Thus, we find that the question of identity was a real one.  The similar acts evidence was relevant to that issue"); *id*. at 1255 (rejecting the proposition "that only unique signature crimes are admissible under the rubric of identity").

With respect to knowledge and intent and the absence of mistake, Rule 404(b) evidence is properly admitted to rebut the defense that a defendant was "merely present" at the scene of a crime or that his association with criminals was unwitting or unknowing.  *See United States* v. *Bruno*, 873 F.2d 555, 561-62 (2d Cir. 1989) ("The government was entitled to prove [the defendant's] intent pursuant to Fed. R. Evid. 404(b) because he had placed his intent in issue by claiming that he was 'merely present' during [crime]"); *United States* v. *Colon*, 880 F.2d 650, 659 (2d Cir. 1989) (same); *United States* v. *Ramirez,* 894 F.2d 565, 568 (2d Cir. 1990) ("When the defendant disavows awareness that a crime was being perpetrated, and the government bears the burden of proving the defendant's knowing possession as an element of the crime, knowledge is properly put in issue").

### C.  Application

i.    Evidence That the Defendant Resided in the Building Into Which
He Fled Following the Robbery Is Admissible

As noted above, the Victim is expected to testify at trial that, shortly after he was robbed, the defendant and Peterson ran into the Building.  Parole Officer-1's testimony that the defendant was present within Building on at least four occasions in 2012 – just months before the Robbery occurred – is therefore admissible as direct evidence of the defendant's guilt.  By establishing that the defendant had access to the Building, the testimony will corroborate the Victim's

anticipated testimony, and rebut any claim by the defense that the defendant was not present during the Robbery, or that the defendant did not run into the Building directly after it.

The Second Circuit has endorsed admission of such testimony on facts similar to these. *See United States* v. *Lumpkin*, 192 F.3d 280 (2d Cir. 1999). In *Lumpkin*, the trial court held that testimony of a police officer that he had "often" seen the defendant in the area where his alleged drug sales occurred was admissible as direct evidence at trial. *United States* v. *Lumpkin*, 192 F.3d at 284. On appeal, the Second Circuit rejected the defendant's argument that the testimony "was impermissible propensity testimony that should have been excluded under Rule 404(b)." *Id.* at 287. That argument failed, the Court explained, because Rule 404(b) was "not controlling" – simply put, there was "no 'other crimes, wrongs, or acts' evidence at issue." *Id*. Noting that the officer "did not testify that he [had] observed [the defendant] engaging in criminal or wrongful conduct," the Court reasoned that "repeated observations of [the defendant] in a certain area over a period of time does not qualify as evidence of a crime or a bad act. Put another way, nothing in [the officer's] observations indicates that [the defendant] is of bad character." *Id.* Accordingly, the Court held, the officer's testimony "simply does not fall within the ambit of other crimes evidence that may be excluded under Rule 404(b)." *Id*. at 287-88; *cf. United States* v. *Wilson*, 107 F.3d 774, 782-83 (10th Cir. 1997) (holding that testimony by police officers about their previous contacts with the defendant was admissible under Rule 404(b) to prove identity).

Because Parole Officer-1's testimony that she observed the defendant in the Building on three occasions in 2012 is relevant to the issues to be tried, corroborates the Victim's testimony, and does not involve other crimes or wrongs, the Government should be permitted to offer it as direct evidence at trial.

ii.    The Defendant's March 5, 2011 Arrest With Kurtis Peterson Is Admissible as Direct Evidence, Or, In The Alternative, As Evidence Of A Prior Bad Act Under Rule 404(b)

On March 5, 2011, the defendant was arrested with Kurtis Peterson and for possessing with intent to sell marijuana.  The Government intends to call the NYPD Officer ("Officer-2") who made the arrests.  Although the Government does not intend to elicit testimony concerning the reason they were arrested, the Government expects that Officer-2 will testify that Officer-2 had observed the defendant and Peterson together on a street corner in the Bronx and arrested them shortly thereafter.  The defendant's March 2011 arrest is admissible as direct evidence necessary to contextualize the defendant's relationship with Peterson, or, in the alternative, to establish identity and knowledge under Rule 404(b).

*First*, the defendant's March 2011 arrest with Peterson serves to explain "how the co-conspirators came to interact with each other, and renders more plausible their joint participation" in the charged Robbery.  *United States* v. *Lasanta*, 978 F.2d 1300, 1307 (2d Cir. 1992); *see also United States* v. *Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009) (*per curiam*) (although evidence of defendant's previous plans with a co-conspirator to import narcotics into the United States through Mexico and the Dominican Republic "did not concern the charged conspiracy, it was relevant background evidence inasmuch as it corroborated the charge that [the co-conspirator] and [defendant] were partners during the charged conspiracy" such that Rule 404(b) did not apply); *Roldan-Zapata*, 916 F.2d at 804 ("The pre-existing drug-trafficking relationship between Akiva and Osario–Serna furthered the jury's understanding of how the instant transaction came about and their role in it.").  Moreover, evidence of the defendant's relationship with Peterson – including their arrest in March 2011 – is admissible to explain the basis for their relationship of mutual trust.  The Second Circuit has held repeatedly that this type of evidence

23

may properly "inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Rosa*, 11 F.3d at 334; *United States* v. *Pipola*, 83 F.3d at 566 (Proof of the background of a conspiracy "may also be used to help the jury understand the basis for the co-conspirator's relationship of mutual trust").

*Second*, to the extent the Court determines that testimony concerning the defendant's March 2011 arrest and association with Peterson is not admissible as direct evidence, it should be admitted under Rule 404(b) to establish identity and opportunity and rebut a claim that the defendant did not know Peterson, or was not with him on the night of the Robbery.

### iii.   The Defendant's Other Arrests Are Properly Admitted Under Rule 404(b)

The defendant's arrest on August 17, 2011 for criminal possession of a switchblade knife, along with his arrest on October 5, 2012 on East 180th Street and Bathgate Avenue in the Bronx, should be admitted under Federal Rule of Evidence 404(b).

*First*, the defendant's August 17, 2011 arrest for criminal possession of a gravity knife is properly admitted under Rule 404(b) to establish that the defendant had the opportunity and knowledge to commit the Robbery.  The Government anticipates calling at trial the NYPD detective ("Detective-1") who arrested Pizzaro for possessing an illegal knife.  The testimony of Detective-1 and the Victim will establish that the knife the defendant possessed when he was arrested in August 2011 was similar to the knife that was used to rob the Victim.  This evidence indicates that the defendant had previously possessed a knife, was likely familiar with how to use one, and therefore had the opportunity to possess the knife used to rob the Victim, and, through his familiarity with the weapon, the knowledge to do so.  *See, e.g.*, *United States* v. *Morales*, 505 F. App'x 30, 34-35 (2d Cir. 2012) (affirming admission of prior traffic stop with an SUV with a

trap door as "probative evidence regarding Morales's knowledge of the trap door and hidden compartment in the SUV."); *United States* v. *Slaughter*, 248 F. App'x 210, 212 (2d Cir. 2007) (evidence showing that a defendant possessed a handgun prior to the charged crime of criminal possession of a handgun is properly admitted to show access to such a weapon); *United States* v. *Robinson*, 560 F.2d 507, 513 (2d Cir. 1977) (*en banc*) (defendant's possession of a rifle when he was arrested "some weeks" after an armed bank robbery with was admissible under Rule 404(b) on the grounds that it tended to show he had the "opportunity" to commit the robbery "since he had access to an instrument similar to that used to commit it").

That the August 2011 arrest occurred over a year before the Robbery does not render it any less probative in establishing that the defendant previously possessed a knife, had access to knives, and knew how to use them.  Indeed, in *United States* v. *Zappola*, the Second Circuit concluded that it was not error to admit testimony that a defendant possessed a handgun six months before he was alleged to have fired a handgun because such evidence "was properly admitted as probative of his access to such a weapon."  677 F.2d 264, 270 (2d Cir. 1982).  And, in a case with facts analogous to this one, another court in this District held that a defendant's arrest in 2002 for possession of firearms was admissible under Rule 404(b) at a trial on charges that the defendant committed an armed robbery *more than six years later.  United States* v. *Taylor*, 767 F. Supp. 2d 428, 438 (S.D.N.Y. 2010) (holding that the prior arrest was "directly relevant to the issue of opportunity and absence of mistake and also admissible to demonstrate [defendant's] ability to access such a weapon."); *but see United States* v. *Garcia*, 291 F.3d 127, 138 (2d Cir. 2002) (drug conviction that occurred twelve years before drug offense at issue at trial not properly admitted where there was a large disparity in quantity of narcotics involved).

*Second*, should the defense at trial claim that the defendant was not present when the

Robbery occurred, the defendant's arrest on October 5, 2012 on the corner of East 180th Street and Bathgate Avenue should be admitted to show identity and absence of mistake. The Government intends to call a NYPD officer ("Officer-3") who is expected to testify that he arrested the defendant on East 180th Street and Bathgate Avenue – just two blocks from the location of the Robbery – on October 5, 2012 – one week before the Robbery occurred. That the defendant was located so close to the scene of the Robbery just days after it was committed shows that the defendant visited with and was familiar with the area, and would rebut the claim that the defendant was not present when the crime occurred.[3]

Finally, there is no basis to exclude evidence of either arrest under Rule 403. Other-act evidence does not create unfair prejudice where the other conduct is no more serious or sensational than the charged crime. *See United States* v. *Williams*, 205 F.3d 23, 34 (2d Cir. 2000); *United States* v. *Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (admitting evidence of prior narcotics transactions in narcotics case where other acts evidence "did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged") (internal quotation marks omitted) (quoting *Roldan-Zapata*, 916 F.2d at 804)). The August 2011 arrest for possession of a knife involves conduct far less serious than the knifepoint Robbery charged in the Indictment. And the Government does not intend to elicit testimony concerning the crime for which the defendant was arrested on October 5, 2012. Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States* v. *Figueroa*, 618

---

[3] To the extent the defense stipulates to the fact that, if called at trial, Officer-3 would testify that he observed the defendant in the vicinity of East 180th Street and Bathgate Avenue in the Bronx, New York on October 5, 2012, the Government will not introduce the fact of the defendant's arrest at trial. This approach will negate any prejudicial effect of the proposed testimony.

F.2d 934, 943 (2d Cir. 1980). Indeed, the proffered evidence here is far *less* prejudicial than the kind of evidence previously approved by the Circuit. *See, e.g.*, *United States* v. *Diaz*, 176 F.3d 52, 76 (2d Cir. 1999) (permitting Government to offer evidence of the defendant's gang affiliation because such evidence would "help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators").

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Government respectfully submits that the Court should issue the orders requested by the Government in this application.

Dated: New York, New York
      July 21, 2015

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:   /s/ Shawn G. Crowley        
        Shawn G. Crowley
        Kan M. Nawaday
        Assistant United States Attorney
        (212) 637-1034/2331

27

**CERTIFICATE OF SERVICE**

The undersigned attorney, being duly admitted to practice before this Court, certifies that on July 21, 2015, the foregoing was served via this Court's CM/ECF service on all parties requiring service.

By: /s/  Shawn G. Crowley
    Shawn G. Crowley
    Assistant United States Attorney

# **<u>EXHIBIT A</u>**

**<u>Rough Transcript of June 8, 2013 Call Between the Defendant and Kurtis Peterson</u>**[1]

Kurtis Peterson ("KP"): Hello?

Ruben Pizzaro ("RP"): Yo?

KP: Yo.

RP: Hello?

KP: Yo.

RP: Yo. What's up bro?

KP: I don't know, my guy.

RP: You good?

KP: Yeah, I'm good.

[Pause]

KP: You know these niggers are tight because I beat these others, HR, far, far some other shit on me. [?]

RP: Yeah, I already know what they got for fall for the situation. [?]

KP: Yeah … that, that shit was nothing that day. We didn't even do nothing crazy that day.

RP: Yeah, you gotta tell them he, he was drunk, though, bro.

KP: Whaatttt?

RP: Yeah, he was drunk that day, bro. He threw a President – a Presidente Dominican drink at you. He was drunk. I remember everything like it was yesterday, bro. It was on camera and on all, bro. Say he threw something at you and was drunk, bro. He started wilding.

KP: Ohh, I didn't even know that. But good, yeah, I'm gonna throw that … Yeah, exactly.

RP: He was drunk that day, nigger.

---

[1] What follows is a rough transcript of the June 8, 2013 phone call prepared by the United States Attorney's Office to provide context for the Court. The audio of the call – which will likely be played at trial – is available at the Court's request.

KP: Yeah, exactly.

RP: He was mad because offering –  he was trying to charge us 15. We was giving him 10 and we tried to jump out.

KP: Yeah, yeah, exactly. That's exactly what my story was. I ain't put in your name, I put someone else's name. That's why I call –

RP: But they're -- they know, they know, they know that nigger Chullo, right?

KP: Nah, they tried to say, they like 'who's skin' and like 'he's dark,' but I'm like, 'that's my friend, Miguel.' [Laughs] Nah, I put a nigger named Miguel in there. I'm like, yeah … And then I fucked up on the other case cuz they were asking me who the fuck was Tyrell Jenkins?

RP: Oh, that shit is open?

KP: That shit is open. Nigga, they wanna know who the fuck is Tyrell Jenkins and why he fucking with us right now?

RP: Damn, bro, that's crazy. Your phone sounds wild low cool right now. [?]

RP: Yo, but what's good, you good? Where you at? You in the Holland [?]?

KP: Nah, I'm in the Boathouse [?] -- I'm Gucci. You know – one of my sons, it's just web as shit, I'm here with – you know who I'm here with? I'm here with Danny Dumbass.

RP: What Danny?

KP: The one, the one with the gage in his head?

RP: Oh yeah, always talking through? [?]

KP: Yeah I [incomprehensible] He was riding my dick. He's on the other side, though he not on this side.

RP: Yeah, bro, that nigger's a dick rider, bro. And [incomprehensible] we got beef, nigga.

KP: Oh, I should get at him a lil bit?

RP: Nah, nah, nah, don't worry about that, bro. Worried about your case, don't worry about nothing. Don't get into no more trouble than you already are.

KP: I know this shit is light, but [incomprehensible] … I know this shit is light …

RP: Miles just calling asking if you had bail. He's trying to bail you out.

KP: Whaatttt?

RP: Yeah.

KP: Shit. Tell that nigger to link up with my pops and shit …

RP: Nah, but you don't want that nigga to link up with your pops and then your pops to think you got something you don't want anything.

KP: Oh yeah, Hell yeah. Hell yeah. I'm gonna beat this shit at Grand Jury. I didn't even know he was drunk, bro. I didn't even know that. I forgot –

RP: He was drunk, bro. You gotta tell 'em that. You don't remember? You didn't smell the beer, nigger? He threw a beer at us in his car, he threw bottles at us and all that?

KP: Yeah, yeah…

RP: You don't remember?

KP: Yeah, now, I do, kinda. You know I got a fucked up memory, my nigger. I just know that we – me and Miguel didn't rob the nigger. I know that shit did not go down –

RP: My picture still up there?

KP: Huh?

RP: My picture still up there? My picture still up there in the 8?

KP: Nah, you clean, they look that stuff down. I see them destroy that shit when they had me.

RP: Oh, so I'm Gucci then?

KP: They just say that – for this shit, that they were tryin' to say, they were tryin' to say it was you, but I told them it was some nigga named Gav [?]. But other shit with this nigger, umm, the paint go into this, he tryin' to say it was me, so you, you been clear with that shit.

RP: Yeah, but I even ain't taking no chances, you hear. You don't worry about nothing, bro.

KP: They don't even know about, about – nothing else.

RP: Yeah, I know, I know, I know that. Cuz they think, they think that other situation was Shimmy.

KP: Yeah, they didn't … Shimmy?

RP: Yeah.

KP: [Laughs] And I heard that nigger didn't go.

RP: Yeah, yeah, I know he didn't, but he's still in that situation. It's bad.

KP: Fuck that.

RP: You heard?

KP: Word.

RP: That's how you do that. You heard? Remember how I always be telling you, bro, that's how you do that, bro.

KP: [Laughs]

RP: That's how you do that, bro.

KP: What's up though? Who you fucking with?

RP: Shit, man, I'm in the crib, all I do is play crib. Run, gar [incomprehensible]

KP: [Incomprehensible] that's how it was going, when I came out for these boys here. [?]

RP: You know what's crazy, bro? You know what got me mad, bro, nigger? I cursed him out. Bitch ass nigga, you gotta pick up your phone. I don't care how much Simone [?] got you on check, cuz that day, that day, that same day that shit was going to happen to you, I was gonna tell you, get low. Cuz I was gonna – get low. Is that you was supposed to get low regardless. One I called and told you you was supposed to get low, you go to Patterson, or you come to my crib. I don't even stay in my crib, bro, you could stay in my crib.

KP:  They keys … They took my shit.

RP: Nigga, but you coulda stay in my crib. All you gotta do is get a copy from my crib of my key. And, nigga, stay in my crib, bro. I got the TV there, I got the PlayStation, there … It's Gucci, bro.

KP: Woah. Woah.

RP: Next time you know, nigga, you stay right in my crib. And it's close to the hood, so you know you go right to the hood whenever you want.

KP: But let the niggers in on me. Bitching in one me. [?]

[Background noise]

RP: Yo, bro, when you come home, bro, you gotta do a bano. You heard? You gotta clean yourself. You heard? You got wild shit on you, bro.

KP: Huh?

RP: When you come home, I'm going to get you a bano. You gotta clean yourself with that, like a [incomprehensible]. Cuz you got wild shit on you, bro. You're too heavy, bro.  You just came home and you get knocked again, bro.

KP: This shit happened 10 months ago, bro.

RP: I know, nigga. That's the situation, nigga.

KP: But they was tight … they was tight. I know it, I know it they was tight.

RP: But nigga pointed you got in a lineup and all that, right I was [cleming?], I was [cleming?]

KP: Yeah [cleming] some niggas – Yeah, they pointed at me in the lineup. … Word.

RP: [Incomprehensible] I got something for that, nigga. You heard?

KP: What? Fuck that shit, you got a kid and shit, bro. You don't want to be in here, bro.

RP: I don't, bro. But that's why – that's why I'm moving the way I'm moving. You should learn from me, bro.

KP: Where the fuck am I gonna go?

RP: Nigga, you got places to go. You just wanna be in the hood all day smoking weed. Bro, you know how long I didn't smoke weed? Like in 2-3 days, bro.

[Pause]

RP: Nigga, I'll be in the park, I'll be in MP.

[Spanish by someone else]

KP: [Laughs] Yup. [To the Spanish speaker.]

RP: Who's that?

KP: You heard that?

RP: No, what did he say?

[Spanish by someone else]

KP: Ahhh, hah.

[Spanish by someone else]

KP: Yeah, you know, you put niggers onto the Colembra? OK? [To Spanish speaker]

RP: You making a commissary?

KP: No, no, my step mother gonna come, Monica is the commissary. I told her – I told my pop to pay 20, but she won't pay a buck fifty again. No, I'm about to get up in it. I'm thinking they gonna keep me here, and then he put all his commissaries.

RP: Nah, nah, you're gonna come home, bro. I'm praying for you. That shit happened a long time ago. He can't even be sure if that was you. How does he – talk to your lawyer, like I want a Motion to Discovery. That's the first thing, I want a Motion to Discovery. How does he know it was me? If that happened 10 months ago, how was he sure to pick me out of a line up? You see what I'm saying? It don't add up.

KP: Yeah, what I was about to say, though … Damn, what the fuck was I about to say? Damn, I forgot that nigga was sauced. You're right though [?] OR that was ripe [?].

RP: I been beefing to talk to your father and let your father know that.

KP: Huh?

RP: I been beefing to talk to your father and let your father know that. But I don't want your father to come in and to bring me in as his fall witness.

KP: Oh no no, what I was about to say, hey, you keep making me forget. You think it was good that I brung [?] with Grand Jury or not?

RP: Yeah

KP: Yeah, right?

RP: Yeah, cuz you always want to know.

KP: Yeah, they said they got DNA, though, that's the only shit –

RP: They said they got your DNA?

KP: Yeah.

RP: On what?

KP: On the car, nigga.

RP: On the car? Whoooh. [Pause] But you gotta tell 'em the truth, you hear? You gotta tell 'em the truth. He was drunk. We gave him $10 out of our money. You could see the cameras, that [incomprehensible], sure. Camera in the cab.

KP: Exactly, I forgot. I forgot that [story?]. Make sure to [call your ma?]. This shit beeped already and shit.

RP: But listen to me, listen to me, before you hang up, listen …

# **<u>EXHIBIT B</u>**

Date:     04/03/2015                                                                                    Facility: BRO
Time:     09:55 AM

## Federal Bureau of Prisons
## TRULINCS
### Message
## Sensitive But Unclassified

| Message |
| --- |

FROM: 68860054 PIZZARO, RUBEN
TO: "KURTIS  PETERSON"
SUBJECT: RE: RE: RE: RE: RE: RE: RE: RE: RE: RE: RE: RE: RE
DATE: 02/15/2015 12:25 PM

-----PETERSON, KURTIS  on 2/14/2015 9:21 PM wrote:

>

-----PIZZARO, RUBEN  on 2/13/2015 3:13 PM wrote:

>

BUT YO MY LAWYER SAYIN THE SAME SHIT WORD THO/ COUGHT THAT NIGGA IN LIKE FIVE LIES IT IS WHAT IT IZ
TRU TALK THAT SAID I GOT LIK FIVE NIGGA BOUT TO COME THREW AND POINT THAT FINGER WHICE I KNOW THEY
BLUFFIN BUT YU KNOW THEY BRING NIGGA I NEVA SAW IN MY LIFE AND HE SAID IF I BLOW I GET 63 OR 11 THAT
FIVE YEARS AND THREE MONTHS OR THEY COOD GIVE ME A DUB I AIN'T WORRIED BOUT NOTHING I AIN'T GOT
NOTHING ANYWAY I LOST EVRYTHING LET THIS BE A WAKE UP CALL 4 YU SO NEXT TIME YU THINK ABOUT SPITTIN
SWOLLOW THAT SHIT AND I KNOW YU PROBABLY FEL LIKE A dick cuz we didnt even rob that nigga or temted to nigga
framed us so when yu go to the town no funny shit just fall back word liv that pa. life/cuz thats the best thing right now the block
got nothing for us but another bid  loooove yu bro